IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **KAREN SIEGER,**<br>10531 Hinton Way<br>Manassas, VA 20112,<br><br>*Plaintiff*,<br><br>v.<br><br>**KRISTI NOEM, Secretary,**<br>U.S. Department of Homeland Security,<br>Office of the Executive Secretary<br>MS 0525 Department of Homeland Security<br>2707 Martin Luther King Jr Ave SE<br>Washington, DC 20528-0525<br><br>Serve:<br><br>    United States Attorney's Office<br>    for the District of Columbia,<br>    Attn: Civil Process Clerk<br>    555 4th St., NW<br>    Washington, DC 20530,<br><br>    Pamela Bondi, Attorney General,<br>    950 Pennsylvania Avenue, NW<br>    Washington, DC 20530-0001,<br><br>*Defendant*. | Docket No. 1:25-cv-547 |

**CIVIL COMPLAINT FOR EQUITABLE AND MONETARY RELIEF
AND DEMAND FOR JURY TRIAL**

Plaintiff Karen Sieger, through counsel, files this civil complaint and jury demand for violations of 42 U.S.C. § 2000e *et seq.* ("Title VII"), as applicable to Defendant U.S. Department of Homeland Security ("DHS").

**Jurisdiction and Venue**

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28

U.S.C. § 1343, as it asserts claims that arise under the Constitution, law or treaties of the United States, specifically Title VII of the Civil Rights Act of 1963, 42 U.S.C. § 2000e *et seq*.

2.  Venue in this District is proper pursuant to 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 703 because the U.S. Department of Homeland Security is headquartered in Washington, D.C., and all actions giving rise to the complaint occurred in Washington, D.C.

**Exhaustion of Remedies**

3.  Ms. Sieger exhausted her administrative remedies for the claims she brings in this Complaint.

4.  On August 6, 2021, Ms. Sieger filed a formal complaint of discrimination, identified as HS-ICE-01156-2021, alleging officials at U.S. Immigration and Customs Enforcement ("ICE") harassed her and discriminated against her based on race and reprisal.

5.  On August 27, 2021, Defendant accepted Ms. Siegers's complaint for investigation, and following the investigation, Ms. Sieger requested a hearing before the U.S. Equal Employment Opportunity Commission ("EEOC"), which identified her complaint as EEOC Hearing No. 570-2022-00733X.

6.  On September 20, 2023, the EEOC granted Defendant's motion for summary judgment, and on October 10, 2023, DHS issued its Final Order adopting the EEOC's decision.

7.  On November 25, 2024, after Ms. Sieger appealed the Final Order to the EEOC's Office of Federal Operations, the EEOC, while finding Ms. Sieger timely and appropriately raised her claims against ICE, nevertheless affirmed the Final Order.

**Parties**

8.  Plaintiff Karen Sieger resides in Manassas, Virginia. The Defendant employs Ms. Sieger as an Information Technology (IT) Cybersecurity Specialist, GS-2210-14, at ICE, a federal

2

law enforcement agency under the U.S. Department of Homeland Security, and employed her during the time relevant to the complaint.

9. Defendant Kristi Noem is being sued in her official capacity as Secretary of DHS. DHS, which committed discriminatory and retaliatory acts giving rise to this action, is an executive agency.

10. Defendant is subject to suit for the discriminatory acts of its employees or agents, committed during the course and in the scope of their employment at DHS. Therefore, Defendant is liable under the doctrine of *respondeat superior*.

**FACTUAL ALLEGATIONS**

11. On October 16, 2019, U.S. Immigration and Customs Enforcement (ICE or Agency) announced that it selected Stephanie Hampton (African American) as Deputy Assistant Director (DAD), Cyber Crimes Center (C3), Homeland Security Investigations (HSI). DAD Hampton previously was the Assistant Director for Investigations (ADI) for the Office of Professional Responsibility (OPR), and prior to that, the DAD for the HSI Workforce Management Division.

12. At the time, Plaintiff Karen Sieger (Caucasian) was an IT Cybersecurity Specialist, GS-2210-14, Cyber Crimes Unit, C3. DAD Hampton became Ms. Sieger's fourth-line supervisor; Division Chief (DC) Robert Kurtz was her third-line supervisor; and Unit Chief (UC) Eliza Jeronimo, Cyber Crimes Unit (CCU), was her second-line supervisor.

13. On or about December 22, 2019, DAD Hampton selected Kanika Cooper (African American) as a Management and Program Analyst (MPA), GS-14, in C3, making DAD Hampton Ms. Cooper's fourth line supervisor. Ms. Cooper previously served as an MPA, GS-13, in OPR under DAD Hampton.

3

14. On July 13, 2020, the Agency posted Job Announcement DAL-INV-10861680-MP-ETA for two Supervisory MPA (Section Chief), GS-14, positions, without reference to the job duties, ICE component or even HSI. The announcement was only open for the minimum time of five days. DAD Hampton explained that one vacancy was in a Cyber Training and Engagement Unit (CTEU) proposed as part of an upcoming, not yet approved, reorganization.

15. Ms. Sieger stated, "To my knowledge, the only announcement that was released about this position. . . did not state any information about the Cyber Crimes Center, a new unit, or that this was a Section Chief position for a new unit." The announcement Ms. Sieger referred to listed five vacancies in HSI, including one Supervisory MPA, GS-14, position in Fairfax, Virginia, with no additional information.

16. Jeremy White (Caucasian), Computer Forensics Analyst, GS-14, stated that while he, unlike Ms. Sieger, knew about the new Unit, he did not apply for the vacancy because DC Kurtz told him that "they have someone else in mind for that Section Chief spot," referring to Ms. Cooper.

17. At the time, C3 had four service contracts: Marshall University, Bluestone, MITRE, and FireEye. Ms. Cooper was unable to serve as the Contracting Officer's Representative (COR) on the MITRE contract, as the task order required the COR to be certified at Level III, while Ms. Cooper was only certified at Level II.

18. On September 14, 2020, DAD Hampton named James (Jay) Stever, Computer Forensics Unit Chief, the acting UC of the CCU, instead of naming a Section Chief within the Unit. UC Stever, who then oversaw two Units, became Ms. Sieger's second-line supervisor.

19. On September 29, 2020, HSI announced that DAD Hampton selected Ms. Cooper as Section Chief, CTEU, indicating, contrary to the evidence, that Ms. Cooper previously "directed

all service contracts as the Contracting Officer's Representative." The email also announced Alvaro Flores' selection as Section Chief, CCU, making him Ms. Sieger's first-line supervisor.

20. DC Kurtz stated that when "Workforce Management decided [] to announce the position I was the selecting official and DAD Hampton was the approving official." DAD Hampton, however, ultimately was the selecting official.

21. When asked, "Did **_the selectee_** [Ms. Cooper] meet all of the criteria/qualifications that you identified above as being most important for this position? If not, please explain . . ." DC Kurtz responded only, "I don't recall." UC Jeronimo, who was on the interview panel, replied, "Ms. Cooper was not the highest rating interviewee based on my own assessment." UC Erin Burke, also on the interview panel, stated, "The selectee was not the most qualified for this position based on the interviews conducted."

22. On or about the same day, September 29, 2020, DAD Hampton placed Ms. Cooper—who had never served in a supervisory role before—in the role of Acting Unit Chief, CTEU, GS-15. This action, or the existence of CTEU, was not announced within C3, as other opportunities to serve in an acting capacity typically are; likewise, the new unit had only one section, contrary to DHS guidelines requiring two sections per unit. When asked about this decision, DAD Hampton explained only that the "CTEU Section Chief position is in the order of succession within the Unit," although she named UC Stevers the acting UC of CCU instead of naming a Section Chief from CCU. DAD Hampton indicated that DC Kurtz was also involved in the decision. DC Kurtz denied this, stating it was DAD Hampton's decision to assign Ms. Cooper as Acting Unit Chief.

23. UC Stever stated that, "the **_ONLY_** C3 employee under DAD Hampton to act as the CTEU Unit Chief was then CTEU Section Chief Kanika Cooper." Ms. Sieger stated that, "had I

5

known that becoming the CTEU Section Chief would automatically make me the Acting CTEU Unit Chief with exclusive access to the position and experience then I would have applied [for the Section Chief position]."

24. The Agency did not announce the creation of CTEU, however, until October 9, 2020, when DAD Hampton announced that the unit would eventually be created as part of a C3 Reorganization. Draft organization charts showed Ms. Cooper as a Section Chief below a vacant CTEU Unit Chief position, with Ms. Cooper being the sole Section Chief reporting to the Unit Chief, unlike the other Units.

25. On November 16, 2020, the Agency issued Job Announcement DAL-INV-10946105-MP-ETA for the CTEU Unit Chief, GS-0343-15, position. Under Conditions of Employment, the Job Announcement indicated, "Current Federal employees must have served 52 weeks at the next lower grade in Federal Service." The Required Documents included an SF-50 that "demonstrates the length of time you have been in your current/highest grade."

26. On November 30, 2020, Ms. Sieger applied for the Unit Chief position and certified, as required, that she had "completed 52 weeks in a position at or above the GS-14 grade.". Ms. Sieger also included the appraisal she was issued on October 24, 2020, with the highest rating of 5, or Achieved Excellence, on every performance goal and competency.

27. Ms. Cooper also applied, although she had not yet held a GS-14 position for 52 weeks, instead holding it only since September 29, 2020. DC Kurtz stated Ms. Cooper "was on the cert[ificate of eligibles] based on her answering the USAJOB questions asking if she had a year or not which made her eligible to be interviewed." The Agency never produced Ms. Cooper's application for the position to verify whether Ms. Cooper indicated she had sufficient service and provided an SF-50 as required. Ms. Cooper's resume shows her excepted service time was at the

Transportation Security Administration at the J Band level, at a salary of $100,013 per year, which is equivalent to GS-13.

28. On December 17, 2020, a panel including DC Kurtz, UC Stever, and UC Erin Burke interviewed Ms. Sieger, Ms. Cooper, and two others whom they deemed to be the best qualified candidates. Following these interviews, the panel ranked the candidates in the following manner:

| Rank | Interviewee | Total Score | Average Score |
|---|---|---|---|
| 1 | Morgan, Kim | 72 | 24 |
| 2 | Seiger [sic], Karen | 67 | 22 |
| 3 | Cooper, Kanika | 50 | 17 |
| 4 | Lee, Maurice | 49 | 16 |

UC Stever explained that DC Kurtz provided the panel's recommendation of Ms. Morgan (Caucasian) to DAD Hampton "who did not accept the recommendation and requested additional interviews. . ." DAD Hampton then insisted that the panel should interview eight additional candidates, whom she specifically identified.

29. On January 8, 2021, DC Kurtz sent an email to DAD Hampton after they interviewed the additional eight candidates with their scores and ranking:

| Rank | Interviewee | Total Score | Average Score |
|---|---|---|---|
| 1 | Morgan, Kim | 72 | 24 |
| 2 | Dimpsey, Kristen | 68 | 23 |
| 3 | Seiger [sic], Karen | 67 | 22 |
| 4 | Roane, Lyndon | 62 | 21 |
| 5 | Thommen, Morgan | 55 | 18 |
| 6 | Nadolski, Erica | 54 | 18 |
| 7 | Cooper, Kanika | 50 | 17 |
| 8 | Vega, Maria | 50 | 17 |
| 9 | Lee, Maurice | 49 | 17 |
| 10 | Dixon, Shana | 47 | 16 |
| 11 | Ransom, Karen | 43 | 14 |
| 12 | Cruz-Spearman, Angella | 38 | 13 |

30. DAD Hampton then "assessed the candidates," including those four initially interviewed and the eight candidates DAD Hampton added to the list, and insisted another panel

interview her top candidates, regardless of how the initial panel ranked those candidates. DC Kurtz stated, "The first interview process/ranking/recommendation was the standard process. We had not done second interviews on section chiefs or unit chiefs in the past."

31. UC Stever stated that "the addition of a second round of SES interviews was something I had not previously seen at C3 . . . ." He further stated that he was not involved in the decision regarding who would receive a second interview (after DAD Hampton's intervention). However, he acknowledged that when he learned there would be a second round of interviews, that he told Ms. Sieger "to expect to be contacted for a second-round interview," explaining, "It was my assumption based on her finishing in the top three interviewees that she would receive additional consideration."

32. Boris Prentiss, who worked under DAD Hampton at OPR, stated that DAD Hampton similarly introduced a second round of interviews in a selection process that he was in, when the first panel did not rank the African American woman who she wanted to select high enough. Following the second-round interview which similarly followed Hampton's intervention there, the African American woman was selected for the job. Mr. Prentiss further stated that "a coworker told me that DAD Hampton said something to the effect of 'all the white male managers put their guys in whatever positions they want, and I'm just doing the same thing.'"

33. Regarding Ms. Sieger, DAD Hampton stated, "The Complainant's resume did not have the criteria/qualifications that I identified above as being most important for this position." As to Ms. Cooper, DAD Hampton stated, "The selectee's resume highlighted important criteria/qualifications for this position." DAD Hampton indicated the most important criteria for this new Cyber Training and Engagement Unit had nothing to do with training or engagement but instead was "Asset/inventory Management; logistics management; ICE financial management

systems (FFMS) experience." This is inconsistent with DAD Hampton's announcement that CTEU will "consolidate the planning and coordination of all cyber training," and "represent HSI Cyber in various policy shops within and outside the Department." As such, the announcement did not properly identify DAD Hampton's later-asserted selection criteria, nor were these criteria stated in Ms. Sieger's interview.

34. Ms. Cooper's resume referenced "logistics management/inventory;" described developing procedures for a "new logistics process with all inventory," "asset management," and mentioned that she approved "all invoices for the service contracts within FFMS." Ms. Sieger's resume, in contrast, highlighted contract management, teaching federal law enforcement and other personnel in cyber related topics, and developing training materials, among other experience she believed was relevant.

35. The other panelists DAD Hampton chose to add for the additional interviews were Tracy Cormier, the Special Agent in Charge (SAC) of St. Paul, and Assistant Director Andre Watson. They interviewed the four candidates DAD Hampton selected including Ms. Cooper, but not Ms. Sieger. SAC Cormier stated that, "I was not aware that there was a first interview until reviewing my calendar and noticing it stated second round." AD Watson stated that "I provided my notes for consideration as deemed appropriate. This was the level of my participation in the process."

36. DAD Hampton scored the candidates on the four, objectively generic interview questions, in the following manner:

| Candidate | Question 1 | Question 2 | Question 3 | Question 4 | Total |
|---|---|---|---|---|---|
| Erica Nadolski | 1 | 1 | 2 | 0 | **4** |
| Kanika Cooper | 5 | 5 | 5 | 5 | **20** |
| Kristen Dimpsey | 4 | 2 | 2 | 3 | **11** |
| Lyndon Roane | 3 | 4 | 3 | 4 | **14** |

9

None of the questions for this CTEU UC job concerned training or cyber policy, or even contract management.

37.     Around this same timeframe, in January 2021, Mr. Flores and DC Kurtz asked Ms. Sieger to "document the negative investigative impacts of the Marshall University Opioid Epidemic Initiative contractual impasse," after Marshall University was ordered to stop work. Ms. Sieger explained the "contractual impasse was due to Ms. Cooper. Ms. Cooper was not performing her COR duties, which permitted Marshall University to produce no work, submit no monthly reports, and submit no invoices through at least November 2020." Mr. Kurtz and Mr. Stever told Ms. Sieger that they knew that Ms. Cooper was not performing her duties, but that Ms. Cooper was not being held accountable due to DAD Hampton. Mr. Kurtz stated that the contract "could not fail" and that Ms. Sieger had to do what she could to keep it going. This contract issue with Ms. Cooper, which occurred prior to her interview, marked the beginning of DAD Hampton and Ms. Cooper together shifting blame for Ms. Cooper's failures onto Ms. Sieger.

38.     After Ms. Sieger prepared the Marshall University Contractual Impasse Executive Summary, DAD Hampton ostracized her "in order to prevent public knowledge of how Ms. Cooper was not performing her duties . . ." Section Chief Matthew Swenson confirmed that DAD Hampton removed Ms. Sieger from several reoccurring meetings. He added that Ms. Sieger "also expressed concern that Kanika Cooper was not adequately doing her job nor was her staff. I believe these concerns were all valid." Mr. Swenson also stated that Ms. Sieger "voiced her concerns that she was being ostracized by C3 management," which was "overlooking these details [raised by Ms. Sieger] to cover for Kanika Cooper's lack of experience."

39.     On February 26, 2021, Ms. Sieger sent an email to Mr. Flores where, among other concerns, she indicated, "I feel like I am being bullied by Kanika [Cooper] in retaliation for

escalating to leadership (to include Kurtz, Stever, and you) her non-performance as a COR." About an hour later, Ms. Cooper emailed Ms. Sieger asking her to call, and Ms. Sieger noticed that Ms. Cooper identified herself as acting Unit Chief in her email signature, which was the first time Ms. Sieger learned there was an acting UC or an opportunity available to act in that role.

40. On March 2, 2021, the Agency notified Ms. Sieger that she was not selected for the Supervisory Management and Program Analyst (Unit Chief), GS-0343-15, position.

41. On March 3, 2021, UC Stever told Ms. Sieger that after he made his recommendation for who should get a second round interview, DAD Hampton told him that his assistance was no longer required. In a memorandum Ms. Sieger prepared, she wrote:

> We continued to talk about how Ms. Cooper's behavior is not consistent with someone who is in the first-time role as a supervisor and section chief. At this point, Stever informed me that she has been serving as acting Unit Chief of CTEU. . .
>
> Stever asked what I wanted him to do given the impossible situation everyone is in with the special treatment Ms. Cooper is afforded by DAD Hampton. He stated that DAD Hampton treats Ms. Cooper as if she were "her own child." Stever also admitted that does appear that Ms. Cooper is sending inappropriate and accusatory emails to many people in what looks like a campaign to document how people are not supporting her. He said that SA Hampton stated that we are not helping a new "black female" supervisor.

Ms. Sieger also wrote this is the first time she received confirmation that Ms. Cooper was named CTEU acting Unit Chief upon selection as the CTEU Section Chief; she explained that this was not announced and that there is no mention in the vacancy announcement that a temporary promotion to a GS-15 acting Unit Chief is a possibility in the role.

42. On March 5, 2021, UC Stever notified Ms. Sieger that DC Kurtz informed DAD Hampton that Ms. Sieger complained to SC Flores that Ms. Sieger felt she "was being bullied by and retaliated against by Kanika Cooper." UC Stever also told Ms. Sieger that DC Kurtz said that

11

he told DAD Hampton that Ms. Cooper might not be ready for the Unit Chief role and that DAD Hampton replied, "Ms. Cooper was ready."

43. On March 8, 2021, DAD Hampton called a meeting for a group including DC Kurtz, Ms. Cooper, Ms. Sieger, and others. DAD Hampton criticized Ms. Sieger and stated that she had not received an update since January on the IDIQ contract and that she was informed no work was being done. Ms. Sieger stated, "The information that DAD Hampton used to criticize my work during the meeting of 08 March 2021 was erroneous and could only have come from Ms. Cooper and her unit in an effort to discredit my work and shift the focus from her own inexperience and lack of expertise."

44. On March 9, 2021, Ms. Cooper called a meeting with DC Kurtz, Ms. Sieger, and others, and accused Ms. Sieger and a coworker of being behind on delivering F[unctional] R[equirements] D[ocuments]. UC Stever corrected her, stating that they were ahead of schedule.

45. On March 10, 2021, UC Stever sent Ms. Sieger an email letting her know that he "informed executive leadership at C3 about your concerns" about Ms. Cooper creating a hostile work environment. In an email to DC Kurtz, UC Stever stated:

> FYSA – I sent this to Karen – she took leave today and her out of office indicated no access to email. I am glad to see she took some time off . . . but the uncharacteristic out office message, coupled with . . . Karen's verbal claim to me that she feels bullied and in a perceived hostile work environment . . . – led me to send Karen the below email. I am worried about her and her health. . . Obviously no contract is worth overstressing, overworking, or C3 losing one of our very best minds and employees. She represents the future of C3 and I fear she is reaching a breaking point. Additionally, she has asked both Eliza and I about Kanika's selection as Section Chief and who was selected as Unit Chief for the position Karen applied. Both Eliza and I indicated we were not the selecting official on either selection and could not speak to any further to that matter. . .

DC Kurtz forwarded UC Stever's emails to DAD Hampton stating, "this is the background on what we discussed last week regarding Karen and her feelings of the hostile work environment as it relates to CTEU and more specifically, Kanika."

46. On March 24, 2021, DAD Hampton announced Ms. Cooper's selection as Unit Chiefs. Ms. Cooper's promotion was effective on March 28, 2021.

47. On March 28, 2021, Ms. Sieger, after learning that Ms. Morgan was the panel's top ranked candidate, spoke to Ms. Morgan who told her that she had been erroneously copied on an email that with the names of those selected for a second-round interview, and that neither she nor Ms. Sieger were included. Ms. Morgan also said that DAD Hampton changed the hiring requirements to mandate that the selectee had to have been a first-line supervisor.

48. On July 1, 2021, DAD Hampton learned that Ms. Sieger complained to EEO about her non-selection for the Unit Chief position.

49. On July 22, 2021, DAD Hampton excluded Ms. Sieger from an on-site visit to Marshall University scheduled for July 28, 2021. Mr. Swenson explained, "They didn't want her weighing in on how the contract was administered," and that he "stated that she should be in attendance as she is the foremost technical SME on the contract." ROI at 839-40. Mr. Swenson also stated:

> It was my option that UC Cooper and her unit, CTEU, was not providing sufficient support to the other units at C3 per their mandate. Other units were doing the lion's share of the contract work and CTEU was taking credit for the other unit's work. I became aware of this at the creation of CTEU. I saw CTEU fail time and time again and excuses were made for them time and time again.

He added that, "I believe Kanika Cooper was being protected by DAD Hampton and that there was nothing we could do about the situation." Meanwhile, DAD Hampton had expressly been informed that the contract had been mismanaged by the Contracting Officer Representatives.

50. DC Kurtz stated, "Based on my observations as Kanika Cooper's first line supervisor, she appeared to be promoted above her capabilities and was having significant challenges grasping the basic fundamentals of successfully meeting the expectations of the unit chief position. DAD Hampton having made the unit chief selection gave the appearance of trying to assist Kanika by being Kanika's mentor." DC Kurtz further stated:

> I . . . remember Kanika Cooper blaming the complainant for any shortfalls as it related to the Marshall contract even when it was Kanika's responsibility. When pressed, Kanika would disengage from speaking to me as her first line supervisor and would engage with DAD Hampton at which I would no longer be involved.

DC Kurtz added, "The only individuals I have heard criticize the complainant's work on the Marshall contract is Kanika Cooper because she lacks the experience to understand the technical nuances of both the contract and cyber subject matter."

51. On November 9, 2021, the Agency issued a Memorandum for the Record to document, "corrective actions taken to regularize an illegal appointment that occurred when Kanika Cooper was selected for a Supervisory Management Program Analyst (Unit Chief) position, GS-0343-15." The Memorandum acknowledged that Ms. Cooper was not qualified for the position but blamed the illegal action on a "junior Human Resources Specialist" who allegedly applied "Ms. Cooper's excepted service time toward her time-in-grade eligibility for the GS-15 position." DAD Hampton subsequently retired.

## CAUSES OF ACTION

### COUNT I
### (Race Discrimination in Violation of Title VII)

52. Plaintiff incorporates by reference herein paragraphs 1–51 of this Complaint.

53. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, prohibits employers from discriminating against employees because of race.

54. Defendant subjected Plaintiff Karen Sieger to discrimination and a hostile work environment based on her race (Caucasian) when the following occurred:

    a. On September 29, 2020, Deputy Assistant Director (DAD) Stephanie Hampton (African American) granted an African American employee exclusive access to the Acting Unit Chief position within the Cyber Training & Engagement Unit (CTEU) without competition, despite the promotion potential of the acting role, in order to give that African American employee exclusive qualifications for the CTEU Unit Chief position, and denied Plaintiff this same opportunity;

    b. On September 29, 2020, DAD Hampton selected an African American employee as CTEU Section Chief (advertised under Vacancy Announcement Number: DALINV-10861680-MP-ETA); and denied Plaintiff the opportunity to compete for this position; and

55. On December 17, 2020, DAD Hampton interfered with the hiring process for Cyber Training & Engagement Unit (CTEU) Unit Chief (GS-15) position (advertised under Vacancy Announcement Number: DAL-INV-10946105-MP-ETA) and selected an African American employee over Plaintiff.

56. As a result of Defendant's actions, Ms. Sieger suffered and continues to suffer harm.

## COUNT II
**(Race Discrimination and Retaliation for Protected Activity in Violation of Title VII)**

57. Plaintiff Karen Sieger incorporates by reference herein paragraphs 1–56 of this Complaint.

58. Plaintiff engaged in protected activity when she filed the EEO complaint underlying this Complaint on December 12, 2023, and when she subsequently pursued it via the EEOC hearing process.

59. Defendant discriminated against Plaintiff and subjected her to a hostile work environment based on race (Caucasian) and retaliation for prior protected activity when:

    a. On January 11, 2021, DAD Hampton ostracized Plaintiff, stopping all communication, providing information and resources to successfully perform her job;

    b. On March 4, 2021, DAD Hampton retaliated against Plaintiff and created a hostile work environment after a Cyber Crimes Center employee made an inquiry to EEO;

    c. On March 5 and 6, 2021, DAD Hampton and a Unit Chief criticized Plaintiff's work on the IT Investigative Support Service IDIQ and Marshall Opioid Epidemic Initiative contracts; and

    d. On July 28, 2021, DAD Hampton excluded Plaintiff from an on-site visit to Marshall University on the day of her EEO mediation meeting.

60. The temporal and substantive proximity of DHS's actions in relation to Plaintiff's protected activities establish a sufficient causal connection to establish a *prima facie* case of reprisal.

61. DHS's actions would dissuade a reasonable employee from engaging in protected activity.

62. As a result of Defendant's actions, Ms. Sieger suffered and continues to suffer harm.

**RELIEF REQUEST**

Wherefore, Plaintiff, by and through counsel, respectfully requests that this Court:

(1) hold that the Defendant subjected Plaintiff to discrimination and harassment based on race and reprisal;

(2) award damages in an amount to be determined at trial, in addition to prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to compensation for severe emotional distress; humiliation; embarrassment; and loss of professional standing, reputation and opportunities;

(3) award damages in an amount to be determined at trial, in addition to prejudgment interest, to compensate Plaintiff for all economic damages, including but not limited to lost past and future income, service credit, and other employment benefits;

(4) retroactive promotion with back pay and back benefits;

(5) grant Plaintiff an award of reasonable costs and attorney fees incurred in this civil action pursuant to 28 U.S.C. § 412; and

(6) grant Plaintiff such other relief as the Court deems just and proper.

## JURY DEMAND

63.     Plaintiff demands a trial by jury on all triable issues set forth herein.

Dated: February 24, 2025               Respectfully submitted,


/s/Debra D'Agostino
Debra D'Agostino
Federal Practice Group
D.C. Bar No. 481942
801 17th Street, N.W., Suite 250
Washington, DC 20006
Phone: (202) 862-4360
Fax: (888) 899-6053
ddagostino@fedpractice.com

*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Civil Complaint for Equitable and Monetary Relief and Demand for Jury Trial was filed on this 24th day of February, 2024 via the Court's CM/ECF filing system.

/s/Debra D'Agostino
Debra D'Agostino