**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| KAREN SIEGER,<br><br>　　　　*Plaintiff*,<br><br>　　v.<br><br>MARKWAYNE MULLIN, SECTRETARY,<br>DEPARTMENT OF HOMELAND<br>SECURITY,[1]<br><br>　　　　*Defendant*. | No. 25-cv-547 (DLF) |

**MEMORANDUM OPINION**

Karen Sieger brings this action against the U.S. Department of Homeland Security (DHS) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.  Compl. ¶¶ 54, 59, Dkt. 1.  Before the Court is Secretary Markwayne Mullin's Motion to Dismiss.  Dkt. 10.  For the following reasons, the Court will grant the motion in part and deny the motion in part.

**I.　　BACKGROUND[2]**

Sieger, a Caucasian woman, is an Information Technology Cybersecurity Specialist at Immigration and Customs Enforcement (ICE), a law enforcement agency under DHS.  Compl.

---

[1] Consistent with Federal Rule of Civil Procedure 25(d), the current Secretary's name has been substituted.

[2] The Court assumes the truth of material factual allegations in the complaint.  *See Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  When deciding a Rule 12(b)(6) motion, the Court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials.  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  Here, the Court considers EEO records in assessing the Secretary's exhaustion arguments.  *Vasser v. McDonald*, 228 F. Supp. 3d 1, 9–10 (D.D.C. 2016) (citing cases).

¶¶ 8, 12.  She alleges that Stephanie Hampton, an African American who served as the Deputy Assistant Director of the Cyber Crimes Center, selected Kanika Cooper, also an African American, as a Management and Program Analyst in December 2019.  *Id.* ¶¶ 11, 13.  In September 2020, Hampton announced that Cooper was selected as the new Section Chief in the Cyber Training and Engagement Unit.  *Id.* ¶ 19.  Sieger says that she did not apply for that position, though it was announced for the minimum period required, because the vacancy announcement did not "state any information about the Cyber Crimes Center . . . or that this was a Section Chief position for a new unit."  *Id.* ¶ 15 (citation modified).  She alleges that a colleague knew about the new position but did not apply because their shared Division Chief, Robert Kurtz, had told him that they already "have someone else in mind," in reference to Cooper.  *Id.* ¶ 16.  According to one interviewer, Cooper "was not the most qualified for this position based on the interviews conducted."  *Id.* ¶ 21 (citation modified).

On or about the same day in September 2020, Hampton gave Cooper another promotion to Acting Unit Chief.  *Id.* ¶ 22.  Sieger alleges that this opportunity "was not announced within [the Cyber Crimes Center], as other opportunities to serve in an acting capacity typically are."  *Id.*  In November 2020, ICE posted the job announcement for the Unit Chief position of the new Cyber Training and Engagement Unit, and Sieger applied two weeks later.  *Id.* ¶¶ 25, 26.  The qualifications for the position included producing an SF-50 showing at least one year in a position at or above the GS-14 grade.  *Id.* ¶ 26.  Sieger, along with Cooper and two others "deemed to be best qualified," interviewed with a panel for the position in December 2020.  *Id.* ¶ 28.  The panel rated Sieger second at 67 points and Cooper third with 50 points.  *Id.*  After Hampton insisted on further interviews of other candidates, *id.*, Sieger was ranked third and Cooper ranked seventh out of twelve interviewees, *id.* ¶ 29.  At Hampton's insistence, a second round of interviews was held

for "her top candidates"—an unusual practice for the Unit, according to two panel interviewers. *Id.* ¶¶ 30, 31.  Hampton stated that she did not select Sieger for this second round because she thought her resume lacked important qualifications for the position and selected Cooper even though her resume lacked experience with the duties listed in the vacancy announcement.  *Id.* ¶ 33. After the additional interviews, Hampton scored Cooper a perfect 20 points, with other candidates falling behind at 14, 11, and 4 points.  *Id.* ¶ 36.  Sieger was rejected on March 2, 2026, *id.* ¶ 40, and Hampton announced Cooper's selection as Unit Chief on March 28, 2021, *id.* ¶ 46.

Sieger alleges that Hampton considered race in making that decision and the earlier decisions to award Cooper the Section Chief and Acting Unit Chief.  *Id.* ¶¶ 54, 55.  This discrimination, she says, is consistent with a colleague's statement that Hampton had similarly introduced second-round interviews in a different office "when the first panel did not rank the African American woman who she wanted to select high enough," resulting in the selection of the African American woman for the relevant position.  *Id.* ¶ 32.  According to that colleague, an unnamed coworker had told him that "Hampton said something to the effect of 'all the white male managers put their guys in whatever positions they want, and I'm just doing the same thing.'"  *Id.* (citation modified).

She further alleges that she was subjected to a hostile work environment and retaliation for reporting discrimination.  *Id.* ¶ 59.  The hostile work environment allegedly began on January 11, 2021, when Hampton "ostracized" Sieger, "stopping all communication, . . . information[,] and resources to successfully perform her job."  *Id.* ¶ 59(a); *see id.* ¶ 38 ("Hampton ostracized her in order to prevent public knowledge of how Ms. Cooper was not performing her duties." (citation modified)).  On February 26, 2021, Sieger complained to a supervisor that she felt "like [she was] being bullied by Kanika Cooper in retaliation for escalating to leadership . . . her non-

performance." *Id.* ¶ 39 (citation modified). At a March 8, 2021 meeting, Hampton criticized Sieger for failure to provide an update on a contract, *id.* ¶ 43, and Cooper accused her of being late on a deliverable at another meeting the next day, *id.* ¶ 44, even though Sieger's deliverables were "ahead of schedule," *id. See also id.* ¶ 59(c) (dating the Hampton meeting to March 5 and 6, 2021). And finally, on July 28, 2021, "Hampton excluded [Sieger] from an on-site visit to Marshall University on the day of her EEO mediation meeting." *Id.* ¶ 59(d).

Hampton allegedly "perceived" that Sieger had engaged in protected activity as early as March 4, 2021, when one of her colleagues made an inquiry with the Equal Employment Opportunity (EEO) office. *Id.* ¶ 59(b); Pl.'s Opp'n 21–22, Dkt. 12-1. But Sieger's initial EEO contact was on April 12, 2021. *Id.* ¶ 58; Pl.'s Opp'n 21 (correcting erroneous date on complaint). In her Pre-Complaint Counseling form, Sieger complained of race and color discrimination in her non-selection for Unit Chief, that Hampton had favored Cooper in selections for the Section Chief and Acting Unit Chief positions, and that Hampton began retaliating after she falsely attributed a co-worker's EEO query to her on March 4, 2021. Pre-Complaint 1, 7, Dkt. 10-2; *see* Compl. ¶ 59(b). On August 6, 2021, Sieger "filed [with DHS] a formal complaint of discrimination . . . alleging [that] officials at [ICE] . . . harassed her and discriminated against her based on race and reprisal." Compl. ¶ 4; *see* Compl. Emp. Discrimination 1, Dkt. 12-2.

On February 24, 2025, Sieger filed this suit asserting that she was denied selection to three positions due to her race, subjected to a hostile work environment, and retaliated against for engaging in protected activity. Compl. ¶¶ 54, 59. Before the Court is the Secretary's Motion to Dismiss her claims. Dkt. 10.

4

## II.  LEGAL STANDARDS

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While this standard does not amount to a specific probability requirement, it does require "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*; *see Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  A complaint need not contain "detailed factual allegations," but factual allegations that are "merely consistent with a defendant's liability . . . stop[] short of the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 678 (citation modified).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the Court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (citation modified).  The assumption of truth does not apply, however, to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (citation modified).  And an "unadorned, the-defendant-unlawfully-harmed-me accusation" is not credited.  *Id.*  Likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### III.    ANALYSIS

The Secretary moves to dismiss Siegers's non-selection, hostile work environment, and retaliation claims.  First, the Secretary argues that Sieger did not timely exhaust her administrative remedies for two of her non-selection discrimination claims.  Def.'s Mot. Mem. 3–5, Dkt. 10-1. For the remaining claims, he argues that she failed to allege sufficient facts to state plausible claims under Title VII.  *Id.* at 6–9.  The Court will address each in turn.

### A.    **Exhaustion of Administrative Remedies**

"Title VII complainants must timely exhaust their administrative remedies before bringing their claims to court."  *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (citation modified).  A federal employee does so by "consult[ing] a[n] [agency] Counselor prior to filing a complaint in order to try to informally resolve the matter," 29 C.F.R. § 1614.105(a), and then filing a formal complaint with their agency, *id.* § 1614.106(a).  "[T]he exhaustion requirement, though mandatory, is not jurisdictional."  *Douglas v. Donovan*, 559 F. 3d 549, 556 n.4 (D.C. Cir. 2009). As such, failure to exhaust is analyzed under Rule 12(b)(6).  *Poole v. U.S. Gov't Publ'g Off.*, 258 F. Supp. 3d 193, 199 (D.D.C. 2017).  Failure to exhaust is an affirmative defense, and thus "the defendant bears the burden of pleading and proving it."  *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997); *see Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998) ("[A]n affirmative defense may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint.").

The Secretary argues that Sieger failed to exhaust her non-selection racial discrimination claims related to the Section Chief and Acting Unit Chief positions.  Def.'s Mot. Mem. 3–5. Claims must be "like or reasonably related to the allegations of the [EEO] charge and growing out of such allegations."  *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (citation

modified).[3]  A claim is "reasonably related" to a charge if, "at a minimum," the claim would "arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination."  *Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 526–27 (D.C. Cir. 2019) (citation modified).

       1.     *Exhaustion*

Sieger's Section Chief and Acting Unit Chief claims are like or reasonably related to the allegations in her Pre-Complaint.  The attachment to her Pre-Complaint explained that the filing "relate[d] to" a Unit Chief position for which Sieger had interviewed in December 2020.  Pre-Complaint 7.  But it further stated that Cooper was "not qualified for this [Unit Chief] job" and that Hampton also favored Cooper "because of her race" in promoting her to the Section Chief and Acting Unit Chief positions.  *Id.*  The Pre-Complaint thus fairly alleged that Hampton selected Cooper for the Section Chief and Acting Unit Chief positions due to her race leading up to her non-selection for the Unit Chief position.  Given that Sieger's charge was that Hampton elevated Cooper in a series of racially motivated promotions, Sieger's claims as to the Section Chief and Acting Unit Chief positions "arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination."  *Haynes*, 924 F.3d at 527 (citation modified).  To

---

[3] Some judges on this Court have concluded that the Supreme Court's decision in *National Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), abrogated *Park*.  *See, e.g.*, *Hartzler v. Mayorkas*, 20-CV-3802, 2022 WL 15419995, at *7–8 (D.D.C. Oct. 27, 2022).  But the D.C. Circuit has not yet decided that issue.  *See Webster v. Del Toro*, 49 F.4th 562, 568 (D.C. Cir. 2022) ("We have twice reserved the question whether *Park* survives *Morgan*.  We do the same here." (citation modified)); *Camero v. Vilsack*, 19-CV-1558, 2022 WL 17752204, at *3 n.3 (D.D.C. Dec. 19, 2022) ("The Court notes that the D.C. Circuit has not settled whether the Supreme Court's holding that 'discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges' in *Morgan* controls over the 'like or reasonably related' standard previously applied by this Circuit." (citation modified)).  Accordingly, "[t]he Court assumes, for purposes of argument, that the 'like or reasonably related standard' continues to apply."  *Camero*, 2022 WL 17752204, at *3 n.3.

be sure, non-selection claims are not necessarily "of a like kind" to other allegations of discrimination. *See Ramos v. Lynch*, 13-cv-328, 2015 WL 11303199, at \*9 (D.D.C. July 7, 2015) ("[A]n allegation of non-selection for a series of unspecified open positions is not 'of a like kind' to the rescission of an existing offer to transfer an employee to another unit."). But here, Sieger's Pre-Complaint alleged that the *same* supervisor promoted the *same* employee to the Section Chief, Acting Unit Chief, and Unit Chief positions in a series of racially discriminatory processes. The Section Chief and Acting Unit Chief claims are thus "of a like kind" to the Unit Chief claim that Sieger's Pre-Complaint pressed in greater detail. Accordingly, Sieger's Pre-Complaint sufficed to exhaust her administrative remedies as to all three of her non-selection claims.

      2.      Timeliness

The Secretary further argues that Sieger failed to seek *timely* EEO counseling for her non-selection claims for the Section Chief and Acting Unit Chief positions.[4] The relevant regulation for federal agency employees, like Sieger, provides that, "[a]n aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). When a plaintiff alleges that she was the victim of a "discrete retaliatory or discriminatory act," the timeliness inquiry focuses on that particular act, even if it is related to acts alleged in timely filed charges. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110–11 (2002). The 45-day clock for federal agency employees may, however, be tolled if the plaintiff

---

[4] The Secretary admits that Sieger timely exhausted "a race discrimination claim based on her non-selection for the Unit Chief position and a retaliation claim based on certain actions in March 2021." Def.'s Mot. Mem. 5. The Secretary does not, however, distinguish between Sieger's retaliation and hostile work environment claims to argue that the latter were not timely exhausted. *See* Def.'s Mot. Mem. 3–5. In the absence of specific argument from the Secretary as to this affirmative defense, the Court will assume that Sieger timely exhausted her hostile work environment claims.

shows that she "did not know and [it] reasonably should not have been known that the discriminatory matter or personnel action occurred." 29 C.F.R. § 1614.105(a)(2); *see Stewart v. Ashcroft*, 352 F.3d 422, 425–26 (D.C. Cir. 2003).

The Secretary has not, at least at this stage, proved that Sieger's claims as to the Acting Unit Chief position were not timely exhausted. Sieger alleges that she learned of Cooper's selection for that position from the signature on an email that Cooper sent on February 26, 2026, which is exactly 45 days before her April 12, 2026 Pre-Complaint. Compl. ¶ 39. She also says that, before seeing this email, she did not know that "there was an acting [Unit Chief] or an opportunity available to act in that role," *id.*, even though Cooper was selected for the Acting position on September 29, 2020, *id.* ¶ 22. Taking Sieger's allegations as true, nothing else in her complaint or incorporated documents establishes that she "should have known," 29 C.F.R. § 1614.105(a)(2), of Cooper's selection before the February 26, 2026 email.

The Secretary nevertheless contends that Sieger should have known about Cooper's selection months earlier because "[i]t is a well-established office practice, which reasonably would have been known to Plaintiff, that an acting role follows the management succession within a unit for supervisory acting positions." Def.'s Reply 8, Dkt. 15. The Secretary argues that Sieger "appears to acknowledge that she knew the Section Chief position was in the order of succession within the unit," and that an October 2020 organizational chart showed a vacant Unit Chief position. *Id.* Thus, Sieger "would have inferred that Ms. Cooper was filling the Acting role of that position." *Id.* But the Secretary's proposed inference, which is premised on presumed familiarity with the office-vacancy practices of a specific department in the civil service, is not supported by the record at this stage. Accordingly, the Court cannot conclude that Sieger should have known of Cooper's selection as Acting Unit Chief before February 26, 2021.

Sieger's claims as to the Section Chief position, however, were not timely exhausted. Her complaint acknowledges that Cooper's selection for that position was announced on September 29, 2020. Compl. ¶ 19. The complaint further notes that the announcement falsely stated that Cooper had "previously directed all service contracts as the Contracting Officer's Representative." *Id.* (citation modified).

Here, Sieger concedes that she knew that Cooper had been selected for the Section Chief position in September 2020. Compl. ¶ 19. Despite the public announcement of Cooper's selection, Sieger argues that "she did not know or have reason to know how blatantly . . . Hampton had manipulated that hiring process until she discussed with others in March 2021 and beyond." Pl.'s Opp'n 6–7. But, under 29 C.F.R. § 1614.105(a)(2), tolling "turns on reasonable knowledge of the event itself, not on reasonable suspicion of the motives behind the event." *Lewis v. McDonough*, 703 F. Supp. 3d 95, 107 (D.D.C. 2023). Moreover, "[c]ourts in this Circuit have routinely held that an employee reasonably should suspect that there might be discriminatory reasons for his or her non-selection (or non-promotion) upon learning that an individual of a different race (or gender, if applicable) was selected (or promoted)." *Armstead v. Jewell*, 958 F. Supp. 2d 242, 246 (D.D.C. 2013); *see Drielak v. Pruitt*, 890 F.3d 297, 299 (D.C. Cir. 2018) ("Knowledge of even one non-selection in favor of an individual who does not share a plaintiff's protected characteristic suffices to tip off a plaintiff to the possibility of discrimination."); *Stewart*, 352 F.3d at 425–26.

Even so, Sieger had enough information to suspect that racial discrimination might have influenced Cooper's selection for the Section Chief position. As the complaint alleges, Hampton surreptitiously advertised the Section Chief position, Compl. ¶¶ 14, 15, Cooper was not the most qualified for the position, *id.* ¶ 21, and the Section Chief announcement erroneously listed Cooper's qualifications, *id.* ¶ 19. Any one of these facts would have heightened a reasonable

10

employee's suspicions of discrimination and thus triggered Sieger's duty to investigate months before February 26, 2021. The EEO tolling provision therefore does not save Sieger's untimely claims as to the Section Chief position.

Because Sieger has not plausibly pleaded that her Pre-Complaint was timely as to her non-selection for the Section Chief position, the Court will grant the Secretary's motion to dismiss that claim and deny as to Sieger's Acting Unit Chief claim.[5]

### B.    Failure to State a Claim

#### 1.    *Non-Selection Discrimination Claims*

The Secretary moves to dismiss Sieger's remaining non-selection discrimination claims for failure to allege sufficient facts. First, he argues that Sieger's non-selection for the Acting Unit Chief position is non-actionable because she did not apply for those positions. Def.'s Mot. Mem. 6–7. Second, he contends that her claim for the Unit Chief position is not viable because she was not the top-ranked candidate after the first round of interviews. *Id.* at 7–8.

---

[5] Even if Sieger timely exhausted her non-selection claim as to the Section Chief position, she fails to state a claim because, as she concedes, she did not apply for the position. *See* Pl.'s Opp'n 11. "Individuals who never applied for a position generally cannot bring a Title VII claim against an employer who failed to hire them for that position." *Brigida v. Chao*, No. 16-cv-2227, 2020 WL 12848947, at *2 (D.D.C. Apr. 5, 2020); *see Lathram v. Snow*, 336 F.3d 1085, 1089 (D.C. Cir. 2003). Further, Sieger fails to show that the Secretary "filled the position without soliciting applications." *Brigida*, 2020 WL 12848947, at *2 (citation modified). While Sieger complains that the posting "was so vague that it effectively precluded any meaningful competition" and "did not contain any information about the unit the job was for and fail to show non-competition for a position," Pl.'s Opp'n 11, her complaint alleges that the announcement "listed five vacancies in [Homeland Security Investigations]," Compl. ¶ 15, and that her colleague "knew about the new Unit" and "did not apply for the vacancy," *id.* ¶ 16. Sieger offers no allegation or argument to explain why her colleague, who is also Caucasian, *id.*, learned of the vacancy announcement, yet she did not. Nor does she argue that she did not apply because doing so would have been futile. *See Brigida*, 2020 WL 12848947, at *2. Indeed, Sieger's theory of discrimination is that (1) she was not aware of the job posting, Pl.'s Opp'n 11, and (2) did not know about the full extent of Hampton's discriminatory practices until March 2021, *id.* at 7.

To state a discrimination claim under Title VII, a plaintiff must plausibly allege that (1) she "suffered an adverse employment action" (2) because of her "race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  In the absence of "direct evidence of discrimination—for example, a statement that itself shows racial or gender bias in the decision," *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011)—a discrimination claim is analyzed under the *McDonnell Douglas* framework, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, the plaintiff has the burden of first establishing a prima facie case of discrimination by showing that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (citation modified).  At the motion to dismiss stage, a plaintiff need not plead facts supporting every element of a prima facie case or anticipate the nondiscriminatory reasons that her employer may proffer.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–14 (2002).  But, taken collectively, "the inferences of discrimination drawn by the plaintiff" must be "reasonable and plausibly supported." *Townsend v. United States*, 236 F. Supp. 3d 280, 298 (D.D.C. 2017); *see Joyner v. Morrison and Foerster LLP*, 140 F.4th 523, 530 (D.C. Cir. 2025) ("[A] plaintiff must plead facts sufficient to allow a plausible inference that the challenged action was taken because of his race.").

i.     Acting Unit Chief Position

Sieger's claim for the Acting Unit Chief position survives the Secretary's motion despite her failure to apply for the position because Hampton denied her the opportunity to compete. *See Carroll v. England*, 321 F. Supp. 2d 58, 68 (D.D.C. 2004) ("[A] plaintiff's failure to apply for a position is excused if her employer filled the position without soliciting applications.").  Hampton

allegedly placed Cooper "in the role of Acting Unit Chief" without announcing the existence of that position within the Cyber Crimes Center "as other opportunities to serve in an acting capacity typically are."  Compl. ¶ 22.

The Secretary contends that Sieger's non-selection owes to Cooper's automatic selection under DHS's internal command structure and Sieger's failure to express interest in the position. *See* Def.'s Reply 8, 11–12.  But the Secretary's contentions about succession are without support in the record and contradicted by Sieger's complaint, *see* Compl. ¶ 22, and Sieger's apparent failure to express interest in the position owes to her allegation that "the existence of" the Cyber Training and Engagement Unit "was not announced," *id.*  At this stage, the Court cannot conclude that Sieger's allegations as to the Acting Unit Chief position fail as a matter of law.[6]

### ii.    Unit Chief Position

Sieger's discrimination claim as to the Unit Chief position also survives the Secretary's motion because she has alleged facts that give rise to an inference of discrimination.  First, she alleges that Hampton changed the criteria and the course of the selection process to favor an African American candidate over higher-ranked Caucasian applicants.  *See* Compl. ¶¶ 47 ("Hampton changed the hiring requirements [after the interviews] to mandate that the selectee had to have been a first-line supervisor."), 30–31 (alleging that Hampton's addition of a second-round interview was contrary to standard practice).  These changes— to which even Hampton's panel interviewers allegedly expressed uncertainty, *id.* ¶¶ 30, 31—coupled with Sieger's other allegations, are sufficiently "irregular or inconsistent with [Cyber Crimes Center's] established

---

[6] The Secretary's plausible-pleading argument as to the Acting Unit Chief claim rested exclusively on Sieger's failure to apply for the position.  *See* Def.'s Mot. Mem. 6–7.  Because Rule 12(b)(6) places its burden on the moving party, the Court will not consider whether Sieger has otherwise stated a plausible claim of racial discrimination in her non-selection for the Acting Unit Chief position.

policies as to make its hiring explanation unworthy of belief," *Porter v. Shah*, 606 F.3d 809, 816 (D.C. Cir. 2010) (citation modified); *see Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003) ("Such an unexplained inconsistency can justify an inference of discriminatory motive.").

Second, Sieger alleges that Cooper was not qualified for the Unit Chief position. *See* Compl. ¶¶ 29 (Cooper ranked seventh out of twelve interviewees after first round of interviews), 27 (Cooper lacked requisite GS-14 position), 34 (Sieger's resume highlighted more relevant experience), 50 (Kurtz noting Cooper being "promoted above her capabilities"). To support her non-selection claim at summary judgment, "[t]he qualifications gap must be great enough to be inherently indicative of discrimination." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (citation modified). "Only then could the fact-finder legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *Id.* (citation modified); *see Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc). The bar is lower at the motion-to-dismiss stage: "a plaintiff need not plead that he was superior to other candidates, he must only plead sufficient facts to raise a reasonable inference of discrimination." *Brown v. McDonough*, 22-cv-3209, 2024 WL 1344417, at *7 (D.D.C. Mar. 29, 2024) (citation modified).

The differences among Cooper's and Sieger's resumes are not, on their own, sufficient to support an inference of discrimination under either standard. But Sieger's allegation that Cooper lacked the requisite year at the GS-14 grade to be eligible for the Unit Chief position, Compl. ¶ 27, raises the specter of Hampton selecting Cooper from beyond a pool of applicants that satisfied the relevant government-service requirements. DHS's Memorandum for the Record allegedly "acknowledged that Ms. Cooper was not qualified for the position" in terms of required

14

government service, *id.* ¶ 51, and the Secretary offers no argument to rebut Sieger's assertion that its faulting of a "junior Human Resources Specialist" was "an uncorroborated assertion," *see* Pl.'s Opp'n 16.  Cooper's selection over Sieger despite her apparent ineligibility for the position further supports a reasonable inference of discrimination in Hampton's hiring process.

Finally, Sieger alleges that Hampton commented to an unnamed colleague "something to the effect of 'all the white male managers put their guys in whatever positions they want, and I'm just doing the same thing'" in reference to her selection of a different African American woman for a different position by similarly introducing a second-round interview.  Compl. ¶ 32.  That comment, if proven by admissible evidence at a later stage, would furnish circumstantial evidence of Hampton's racially discriminatory intent in hiring, even if not specifically directed at the Unit Chief process.  "Although [the D.C. Circuit] ha[s] found that an isolated race-based remark unrelated to the relevant employment decision could not, without more, permit a jury to infer discrimination, [it] ha[s] not categorically labeled such comments immaterial."  *Morris v. McCarthy*, 825 F.3d 658, 669–70 (D.C. Cir. 2016) (citation modified).  "To the contrary, [the court] ha[s] found these types of statements to support a verdict for a Title VII plaintiff."  *Id* at 670.  The Supreme Court has further cautioned courts against "discount[ing]" an employer's discriminatory comments "on the ground that they were not made in the direct context" of the adverse action suffered by the plaintiff.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 152–53 (2000).  Considered alongside Sieger's allegations about the process leading to Cooper's selection, Hampton's discriminatory comment supports a reasonable and plausible inference that Sieger was denied the Unit Chief position because of her race.

The Secretary, however, contends that Sieger's claims fail because "she was never the top-ranked candidate for the [Unit Chief] position" and, as such, her "pleadings show that the

Department would not have selected her for the position absent race discrimination." Def.'s Mot. Mem. 8. The Secretary is correct that Sieger was ranked second and then third after additional interviews, both times behind at least one other Caucasian candidate. Compl. ¶¶ 28, 29. But her Unit Chief claims do not fail as a matter of law because it is plausible that Hampton's alleged racial bias—as reflected in her changing of the selection criteria, rating of candidates, excluding of Sieger from the final round, and ultimate selection of Cooper despite her significantly lower score at the first round—was the but-for cause of Sieger's non-selection for the Unit Chief position. Indeed, even Kim Morgan—who was the top-ranked candidate initially and after the committee interviewed additional candidates—was not selected by Hampton for an apparently critical second-round interview from which she hired Cooper, who had previously ranked third and seventh, for the Unit Chief position. *See* Compl. ¶¶ 28, 29, 36. At this early stage, Sieger has plausibly alleged facts to show that race was the but-for cause of her non-selection for Hampton's final-round interview and, thus, a chance at promotion to the Unit Chief position.

2.    *Hostile Work Environment Claim*

The Secretary argues that Sieger's hostile work environment claim fails because (1) "she does not plausibly allege . . . actions either severe or pervasive enough to constitute a hostile work environment" and (2) "even assuming a hostile work environment existed, she does not plausibly allege that such environment was due to her race." Def.'s Mot. Mem. 8.

To prevail on a hostile work environment claim, a plaintiff must show that her employer "subjected h[er] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The hostility standard is "sufficiently demanding to ensure that Title VII does not become

a 'general civility code.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  Thus, sporadic incidents of

rude or unprofessional behavior are insufficient to establish an environment of "severe or

pervasive" hostility.  *Barbour v. Browner*, 181 F.3d 1342, 1348–49 (D.C. Cir. 1999).

First, Sieger fails to state a plausible hostile work environment claim because the

"ostracization" she endured was not sufficiently severe or pervasive.  She alleges that Hampton

"shift[ed] blame" for Cooper's failures on a contract to her, Compl. ¶ 37; that she felt "bullied by

and retaliated against by" Cooper for complaining, *id.* ¶ 42 (citation modified); that Hampton

erroneously "criticized" her in a meeting for lack of an update on her work, *id.* ¶ 43; that Cooper

accused her of being behind schedule in another meeting, *id.* ¶ 44; and that Hampton excluded her

from an on-site visit to a client, *id.* ¶ 49.  But, even construing all allegations in Sieger's favor,

these conditions amount to little more than typical workplace grievances and conflict between a

supervisor and an employee, and "[a] mere 'nasty' attitude exhibited by a supervisor is insufficient

to establish a hostile atmosphere, especially where, as here, there is no evidence that the 'nasty'

attitude is pervasive and constant."  *Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840, 849 (D.C.

Cir. 2001); *see Allen v. Napolitano*, 774 F. Supp. 2d 186, 205 (D.D.C. 2011) ("[A plaintiff's]

claims that she was excluded from meetings, received unreasonable deadlines, denied training

opportunities, and assigned busy work assignments did not cause objectively tangible harm to the

terms or conditions of her employment.").

Moreover, plaintiffs cannot "bootstrap their alleged discrete acts of retaliation [or disparate

treatment] into a broader hostile work environment claim."  *Baloch v. Norton*, 517 F. Supp. 2d

345, 364 (D.D.C. 2007), *aff'd sub nom.*, *Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008);

*see Hampton v. Vilsack*, 760 F. Supp. 2d 38, 57 (D.D.C. 2011) ("Plaintiff cannot . . . rely on the

discrete acts upon which he bases his discrimination and retaliation claims to support a hostile work environment claim."), *aff'd*, 685 F.3d 1096 (D.C. Cir. 2012).  Here, Sieger predicates her hostile work environment claim, *see* Compl. ¶ 54, on the same actions on which she bases her hiring discrimination claims, *see id.*, and her retaliation claim, *see id.* ¶ 59.  It is unclear which allegations Sieger attributes to her general hostile work environment claim, but even assuming all of the pre- and post-protected activity allegations went to proving a hostile work environment, her allegations would not suffice to state a claim under Title VII.

Second, even if Sieger had alleged a sufficiently hostile work environment, her claim would fail because she does not link Hampton's and Cooper's hostilities to her race.  "Courts in this jurisdiction have routinely held that hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class."  *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009).  Although Sieger's allegations support an inference that Hampton may have discriminated against Sieger in job selection based on her race, nothing in her complaint establishes that Hampton's hostility to Sieger was because of her race.  "[N]one of the comments or actions directed at [Sieger] expressly focused on [her] race, religion, age, or disability—unlike in some hostile work environment cases."  *Baloch*, 550 F.3d at 1201.  To the contrary, Sieger alleges that Hampton's hostile actions started with ostracizing her "in order to prevent public knowledge of how Ms. Cooper was not performing her duty."  Compl. ¶ 38 (citation modified). Sieger also says that she felt like she was being bullied by Cooper because she had complained to leadership about her non-performance.  *Id.* ¶ 39.  Sieger's allegations fail to support an inference that these hostilities owe to her race rather than office politics.  *See Sledge v. District of Columbia*, 63 F. Supp. 3d 1, 24 (D.D.C. 2014) ("[M]any bosses are harsh, unjust, and rude, and it is therefore important in hostile work environment cases to exclude from consideration personnel decisions

that lack a linkage of correlation to the claimed ground of discrimination or retaliation; otherwise, the federal courts will become a court of personnel appeals." (citation modified)).  Accordingly, the Court will grant the Secretary's motion to dismiss Sieger's hostile work environment claim.

3.      *Retaliation Claim*

Sieger further alleges that "her supervisors retaliated against her based on both their belief that she had contacted the EEO, and, later, her actual contact."  Pl.'s Opp'n 21.  Specifically, she says that Hampton "ostracized" her, excluded her from communications, meetings, and trips, and unfairly criticized her work.  *See* Compl.  ¶¶ 38, 39, 43, 44, 59(c).

The standard that governs retaliation claims echoes that of discrimination claims.  Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee who (1) "has opposed any practice made an unlawful employment practice by [Title VII]"; or (2) "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  To state a retaliation claim, a plaintiff must allege that "(1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action by her employer, and (3) the two are causally connected."  *Spence v. U.S. Dep't of Veterans Affs.*, 109 F.4th 531, 539 (D.C. Cir. 2024) (citation modified).

Sieger fails to allege a materially adverse action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (citation modified).  First, several of Sieger's allegations cannot support a retaliation claim because they predate her engaging in statutorily protected activity.  *See Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 79 (D.D.C. 2009) ("The fact that the allegedly retaliatory actions preceded the protected activity precludes a determination that the protected activity caused the defendant to retaliate against the plaintiff."); *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).  Sieger alleges Hampton's hostility toward her began on January 11,

19

2021.  *See* Compl. ¶ 38 ("After Ms. Sieger prepared the Marshall University Contractual Impasse Executive Summary, DAD Hampton ostracized her 'in order to prevent public knowledge of how Ms. Cooper was not performing her duties.'").  But even crediting her allegation that Hampton erroneously believed that she had made an EEO inquiry on or around March 4, 2021, *see* Pre-Complaint 7; Compl. ¶ 59(b), Sieger does not explain how Hampton's initial actions could be causally related to her false impression of protected activity that occurred almost two months later.[7]  "Because retaliation, by its very nature, requires the protected activity to occur before the complained about conduct," *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 01-cv-2221, 2024 WL 4298853, at \*56 (D.D.C. Sept. 26, 2024), Sieger fails to establish a causal connection between her engagement in protected activity and Hampton's allegedly hostile actions before March 4, 2026.

Second, Sieger's allegations of hostility following March 4, 2021, are not severe enough to be materially adverse.  "To be materially adverse, the employer's action must be more than 'those petty slights or minor annoyances that often take place at work and that all employees experience.'"  *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)).  "Typically, a materially adverse action in the workplace involves a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Id.* (citation modified).  Here, Sieger alleges that Hampton and Cooper retaliated against her on March 8 and 9, 2021, by "criticiz[ing] [her] work on" two

---

[7] Sieger instead attempts to tie Hampton's "earliest harassment" to her January 11, 2021 complaints about Cooper's poor performance.  *See* Pl.'s Opp'n 21; Compl. ¶¶ 37, 38.  But Sieger cannot backdate her protected activity to allegations about her January 2021 statement to her supervisors regarding Cooper "not performing her . . . duties," Compl. ¶ 37, because "ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity," *Clemmons v. Acad. for Educ. Dev.*, 107 F. Supp. 3d 100, 128 (D.D.C. 2015) (citation modified).

contracts, Compl. ¶¶ 43, 44; *see also id.* ¶ 59(c) (alleging Hampton's critical comments at the meeting but dating them to March 5 and 6, 2021), and "excluded [her] from an on-site visit to [a client] on the day of her EEO mediation hearing," *id.* ¶ 59(d); *see id.* ¶ 49.[8]  Such minor actions do not "demonstrate [the] objectively tangible harm" necessary for her retaliation claim. *Bridgeforth*, 721 F.3d at 663; *id.* ("[N]ot everything that makes an employee unhappy is an actionable adverse action." (citation modified)).  Further, as noted, *see supra* at 18, Sieger alleges that Cooper's and Hampton's subsequent actions were part of an ongoing course of mistreatment that had no relationship with Sieger's protected activity.  *See* Compl. ¶¶ 38, 39.  Because Sieger fails to plausibly allege materially adverse actions that are causally linked to her engagement in protected activity under Title VII, the Court will grant the Secretary's motion to dismiss her retaliation claims.

## CONCLUSION

For the foregoing reasons, the defendant's Motion to Dismiss, Dkt. 10, is granted as to the plaintiff's discrimination claim for the Section Chief position, hostile work environment claim, and retaliation claim and denied as to the plaintiff's discrimination claims for the Acting Unit Chief and Unit Chief positions.  A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

April 14, 2026

---

[8] Sieger cannot connect her non-selection for the Unit Chief position to the alleged retaliation because she concedes that "the Agency notified [her] that she was not selected for the" position on March 2, 2021, Compl. ¶ 40, before Hampton erroneously perceived that she had engaged in protected activity on March 4, 2021.